UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

"JOHN DOE," and "JOHN DOE II,"                          **AMENDED**
                                                        **COMPLAINT**
                        Plaintiffs,

        -against-
                                                        **Case No. 16-CV-6869**

THE NATIONAL RAMAH COMMISSION, INC.,
THE NATIONAL RAMAH COMMISSION OF THE
JEWISH THEOLOGICAL SEMINARY, THE                        (*Hon. Nelson S. Roman*)
JEWISH THEOLOGICAL SEMINARY, RABBI DAVID
SOLOFF, RABBI KENNETH GREENE, RABBI MELVIN
N. SIRNER, and RABBI SHELDON DORFF,

                        Defendants.
_____x


Respectfully submitted by:

Kevin T. Mulhearn, P.C.
60 Dutch Hill Road, Suite 15
Orangeburg, New York 10962
Phone: (845) 398-0361
Fax: (845) 398-3836
Email: kmulhearn@ktmlaw.net

*Attorneys for Plaintiffs*

Plaintiffs, by and through their attorneys, Kevin T. Mulhearn, P.C., complaining of the Defendants, hereby allege that:

## JURISDICTION AND VENUE

1.     This Court has exclusive jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

2.     Venue is proper in the Southern District of New York pursuant to 18 U.S.C. § 1965 (c) and 28 U.S.C. § 1391(b), because the claims arose in this District and the Plaintiffs reside in, transact business in, or maintain a principal place of business in this District.

## PARTIES

3.     Plaintiff JOHN DOE, an individual man seeking to remain anonymous in view of the extremely personal nature of the allegations herein, is designated throughout this Complaint as "JOHN DOE," a pseudonym.

4.     JOHN DOE resides in the County of Westchester, State of New York.

5.     Plaintiff, JOHN DOE II, an individual man seeking to remain anonymous in view of the extremely personal nature of the allegations herein, is designated throughout this Complaint as "JOHN DOE II," a pseudonym.

6.     JOHN DOE II resides in the County of Westchester, State of New York.

7.     Defendant, the National Ramah Commission, Inc., at all material times, has owned, managed and operated numerous Camp Ramahs in the United States, including Camp Ramah in the Berkshires (Wingdale, New York).  Its principal place of business is 3080 Broadway, New York, New York 10027.

8.     Defendant, The National Ramah Commission of The Jewish Theological Seminary, is the coordinating body of the camping arm of Conservative Judaism, providing

oversight and educational planning on behalf of the network of Ramah camps throughout North America and Israel.

9.      Upon information and belief, at all material times, Defendant, The National Ramah Commission of The Jewish Theological Seminary, oversees, operates, manages, owns and controls the National Ramah Commission Inc., and all Camp Ramahs in the United States. Its principal place of business is 3080 Broadway, New York, New York 10027.

10.      The Jewish Theological Seminary is a prominent institution of Jewish higher education, training rabbis, throughout the United States.

11.      Upon information and belief, at all material times, Defendant, The Jewish Theological Seminary, oversees, operates, manages, own and controls, The National Ramah Commission, Inc., The National Ramah Commission of The Jewish Theological Seminary, and all Camp Ramahs in the United States.  Its principal place of business is 3080 Broadway, New York, New York 10027.

12.      Upon information and belief, Defendant, RABBI DAVID SOLOFF resides in the State of Illinois.

13.      Upon information and belief, Defendant, RABBI KENNETH GREENE, resides in the State of Florida.

14.      Upon information and belief, Defendant, RABBI MELVIN N.  SIRNER, resides in the State of New York.

15.      Upon information and belief, Defendant, RABBI SHELDON DORFF, resides in the State of California.

## BACKGROUND

16.     Camp Ramahs are camps for Jewish children; these camps endeavor to, *inter alia,* educate camp members as to Jewish traditions, history, and values—and thus have a significant religious and educational, not merely recreational, components.

17.     At all material times, each of the institutional Defendants has received federal funding for various educational programs at its Camp Ramah locations, including but not limited to Camp Ramah in the Berkshires (Wingdale), State of New York.

18.     At all material times, therefore, each of the institutional Defendants has been subject to requirements of Title IX.

19.     In the Summer of 1971, a Camp Ramah employee, Harvey Erlich, a camp counselor-in-training, repeatedly sexually abused multiple Camp Ramah children, including each Plaintiff.

20.     Erlich had previously molested several boys in his bunk at bedtime.

21.     Erlich's sexual assaults of numerous Camp Ramah children were known to various high-ranking camp administrators and officials, including high-ranking administrators and officials at Camp Ramah, The National Ramah Commission, Inc., The National Ramah Commission of The Jewish Theological Seminary, and The Jewish Theological Seminary.

22.     However, these administrators and official nevertheless failed to take action against Erlich, never reported him to child protective services or to law enforcement authorities, and—despite actual knowledge of his propensity to sexually and physically assault boys—never took any significant measures to prevent Erlich's future abuse of children.

23.     At all material times, Defendants and Camp Ramah administrators and officials consistently and cravenly defrauded prospective campers, campers, and their parents, by falsely

representing, both orally and through interstate and intrastate mailings of correspondence, brochures, and advertisements, delivered through the United States Post Office, that Camp Ramah (in the Berkshires) was a safe haven for their intellectual, emotional, and spiritual growth and enlightenment.

24.     These false representations and incomplete testimonials about Camp Ramah were repeatedly and regularly (more than once a year) delivered to Plaintiffs, as well as scores of other Jewish boys and families, from in or before 1970 through 2016 (i.e., in consecutive years).

25.     Upon information and belief, in or about the Summer of 1971, beginning on or about June 28, 1971, Erlich sexually assaulted numerous Camp Ramah children, including a number of boys who were between ten and thirteen years old.

26.     Upon information and belief, soon thereafter, these assaults were reported to Camp Ramah officials, including Rabbi David Soloff, then Assistant Camp Director, Rabbi Kenneth Greene, then Division Head for campers in JOHN DOE and JOHN DOE II's age group, Rabbi Sheldon Dorff, then Camp Director, and Rabbi Melvin N. Sirner, then an administrator in charge of the Counselor-In-Training program at Camp Ramah, and other officials at The National Ramah Commission, Inc., The National Ramah Commission of The Jewish Theological Seminary, and The Jewish Theological Seminary.

27.     Rabbi Soloff, Rabbi Greene, Rabbi Sirner, and Rabbi Dorff, all went on to pursue multi-decade careers as important, revered, and esteemed leaders in the conservative Jewish movement.

28.     Rabbi Soloff, in fact, served as Director of another Ramah Camp in Wisconsin for over 30 years.

29.     Nevertheless, Camp Ramah officials and administrators, including Rabbi David Soloff, Rabbi Kenneth Greene, Rabbi Sheldon Dorff, and Rabbi Mel Sierner, and other officials at The National Ramah Commission, Inc., The National Ramah Commission of The Jewish Theological Seminary, and The Jewish Theological Seminary, failed to take any action to protect its Camp Ramah children, including Plaintiffs, from the predations of Erlich, a known sexual predator and abuser of boys.

30.     Camp Ramah officials, and other officials at The National Ramah Commission, Inc., The National Ramah Commission of The Jewish Theological Seminary, and The Jewish Theological Seminary, failed to report Erlich and his crimes to law enforcement officials; failed to fire Erlich; and failed to warn any Camp Ramah boys, including Plaintiffs, of the known and severe dangers presented by the continued presence of Erlich on Camp Ramah camp grounds.

31.     As a direct result of the aforesaid acts and omissions of Camp Ramah, in or about 1971 (from approximately July 7, 1971 through July 23, 1971), on approximately ten (10) occasions, while JOHN DOE II was attending Camp Ramah, Erlich sexually assaulted and sodomized JOHN DOE II at Camp Ramah.

32.     As a direct result of the aforesaid acts and omissions of Camp Ramah, in or about August 1971, on several occasions, while JOHN DOE was attending Camp Ramah, Erlich sexually assaulted and sodomized JOHN DOE at Camp Ramah.

33.     After his assaults of JOHN DOE II and JOHN DOE, Harvey Erlich threatened each of them, and told them, in words or substance, that they would face severe ramifications if they reported his sexual assaults to any authorities.

34.     Erlich told JOHN DOE II that if JOHN DOE II reported him to camp authorities, he (Erlich) would make sure that JOHN DOE II would be blamed for the incident and suffer the consequences.

35.     On or about July 23, 1971, JOHN DOE II became distraught, inconsolable, and extremely agitated.  He told Rabbi Greene, Rabbi Sirner, and Rabbi Dorff, during separate meetings with each of them, that Harvey Erlich had acted extremely inappropriately towards him, to such an extent that he was afraid to go back to his bunk.

36.     JOHN DOE II told Rabbi Greene, Rabbi Sirner, and Rabbi Dorff, in turn, that he was "scared" and "afraid" of Harvey Erlich, and that he (JOHN DOE II) wanted to go home with his parents (who were scheduled to visit the camp the next day for Parents' Day).

37.     Despite JOHN DOE II's specific complaints about Erlich, neither Rabbi Greene, Rabbi Sirner, nor Rabbi Dorff, took any disciplinary action against Harvey Erlich, fired Harvey Erlich, reported Harvey Erlich to law enforcement officials, warned any of the campers (or their parents) about Harvey Erlich and his known propensity to sexually abuse boys, or otherwise took any action to protect Camp Ramah campers from Erlich's known predations.

38.     In 1971, Camp Ramah was thus an extremely dangerous place, where a vicious, malicious, and sadistic sexual predator roamed free to pick off his innocent prey by relying upon the respect and reverence he commanded by virtue of his position of authority at the camp.

39.     Camp Ramah officials, and other officials at The National Ramah Commission, Inc., The National Ramah Commission of The Jewish Theological Seminary, and The Jewish Theological Seminary, moreover, deceived and defrauded many persons, including Plaintiffs, by failing to warn parents, campers, and prospective campers, that a known danger (i.e., a known recidivist sex offender, existed at the camp and in fact held a position of employment with

supervisory authority over young boys), and that Camp Ramah knowingly and willfully permitted this known sexual predator to exercise his position of authority and used that position to prey upon and sexually assault numerous Camp Ramah campers, including Plaintiffs.

40.     Camp Ramah officials, and other officials at The Nationals Ramah Commission, Inc., The National Ramah Commission of The Jewish Theological Seminary, and The Jewish Theological Seminary, as well as the individual defendants, never notified any parents, former campers, or campers, that it had received any credible complaints from campers (or others) about Erlich sexual abusing boys at Camp Ramah.

41.     Upon information and belief, Camp Ramah officials, and other officials at The National Ramah Commission, Inc., The National Ramah Commission of the Jewish Theological Seminary, and The Jewish Theological Seminary, including the individual Defendants, ignored numerous sex abuse complaints against Harvey Erlich, which were made to Camp Ramah administrators and officials, and other officials at The National Ramah Commission, Inc., The National Ramah Commission of The Jewish Theological Seminary, and The Jewish Theological Seminary in 1971, because confronting these complaints, and responding to them with care, compassion, transparency, and concern for humanity, would have harmed Camp Ramah's (and each of the Defendant's) name and reputation.

42.     On or about November 1, 2012, Harvey Erlich was arrested in Ontario, Canada, on charges of sexually assaulting an 11-year-old boy while in a synagogue and sexually assaulting a second boy, age 13, in a home.

43.     In Canada, upon information and belief, there is no statute of limitations for the sexual assaults of children.

44.     Under Jewish law, including Rabbinical laws that are strictly adhered to by members of Orthodox Jewish communities, statutes of limitation do not exist.  Under Jewish law, therefore, if a wrong was committed against a person, if someone was harmed, he will always have the right to seek justice.

45.     In 2015, Harvey Erlich pleaded guilty (in the Ontario Court of Justice) to three counts of gross indecency and admitted the facts of a fourth incident that date back to the 1970s and 1980s.

46.     At the time Harvey Erlich sexually assaulted these four boys (who ranged in age from 9 to 13), he was the conductor of several boys' choirs in the Toronto Jewish community.

47.     At this point, it is impossible to calculate precisely how many boys Harvey Erlich sexually assaulted and/or sodomized from 1971—during his employment at Camp Ramah—until his arrest in Canada in 2012.

48.     Upon information and belief, Defendants' protection of Harvey Erlich—after they knew that he was a sexual predator with a propensity to sexually abuse boys—led directly to the sexual assaults of numerous other boys by Harvey Erlich throughout the years.

49.     Indeed, Defendants' failure to notify law enforcement officials of Harvey Erlich's known criminal acts, permitted Harvey Erlich to obtain numerous positions of authority within the Jewish community in which he had unfettered access to vulnerable young boys, a number of whom—by his own admission—he sexually assaulted.

## COUNT I: VIOLATION OF TITLE IX

50.     Plaintiffs hereby repeat and reallege each of the allegations contained in paragraphs "1" through "49" hereinabove, as if each has been fully set forth at length.

51.     Title IX, 20 U.S.C. § 1681(a), provides in pertinent part that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

52.     Title IX regulates private entities and educational institutions which choose to receive federal funding.

53.     Title IX provides a private cause of action against a recipient of federal funds for discrimination based on sex, sexual harassment and sexual abuse.

54.     A single sexual assault constitutes severe and objectively offensive sexual harassment for Title IX purposes.

55.     Camp Ramah, and each of the institutional Defendants, upon information and belief, were at all material times recipients of Federal financial assistance, and thus subject to Title IX, because, upon information and belief: (1) at all material times, the camp's attendees (and institutional entities) received federal financial aid; (2) at all material times, the camp, and Defendants, have been exempt from paying federal taxes (i.e., were tax exempt entities), and an exemption from federal taxes produced the same result as a direct federal grant (i.e., the camp possessed funds that otherwise would have belonged to the Government);and (3) the camp, and each of the institutional Defendants, at various times, from 1971 to present, upon information and belief, received federal loans and other federal financial assistance for various construction, educational, and/or rehabilitation projects.

56.     Defendants are liable to the Plaintiff under Title IX because, upon information and belief, at all material times, they were deliberately indifferent to multiple acts of discrimination (i.e., Erlich's sexual assaults of boys), that were known to high-ranking camp officials (with remedial authority), and which occurred under their control, including on Camp

Ramah premises and in its facilities, during camp hours, and during its normal hours of operation of its educational programs and activities.

57.     Indeed, Defendants' deliberate indifference both directly caused Erlich's abuse of boys to occur and made male campers, including Plaintiffs, vulnerable to such abuse, and that abuse did occur and took place in a context subject to Camp Ramah's control and on camp grounds.

58.     At all material times, for the reasons set forth herein, and upon information and belief, officials of Camp Ramah, and other officials at The National Ramah Commission, Inc., The National Ramah Commission of The Jewish Theological Seminary, and The Jewish Theological Seminary, who had authority to institute corrective measures on the camp's behalf, had actual notice of, and were deliberately indifferent to, Erlich's sexual misconduct.

59.     Camp Ramah and their administrators, and other officials at The National Ramah Commission, Inc., The National Ramah Commission of the Jewish Theological Seminary, and The Jewish Theological Seminary, as stated above, had knowledge of a substantial risk of serious harm to campers, such as Plaintiffs, in a context where multiple prior allegations of physical and sexual abuse were lodged against Erlich, and Erlich's proclivities for sexual abuse of boys, and his actual sexual abuse of boys, were well known to Camp Ramah administrators and officials.

60.     Upon information and belief, at all material times, Erlich targeted, discriminated against, sexually harassed, and sexually abused Plaintiffs because they were boys, and Camp Ramah administrators and officials, and other officials at The National Ramah Commission, Inc., The National Ramah Commission of The Jewish Theological Seminary, and The Jewish Theological Seminary, and the individual defendants, had actual knowledge that Erlich was

discriminating against, sexually harassing, and sexually abusing children because they were boys.

61.     Camp Ramah's officials' (and other officials at The National Ramah Commission, Inc.,  The National Ramah Commission of The Jewish Theological Seminary, and The Jewish Theological Seminary), including the individual defendants', response to Erlich's known discrimination constitutes deliberate indifference and was clearly unreasonable in light of all of the known circumstances.

## TITLE IX ACCRUAL ISSUES

62.     Federal law governs the determination of the point at which the limitations period begins to run on a Title IX suit.

63.     When, as in this case, the Defendants fraudulently conceal their own wrongdoing, to the extent that a plaintiff is not capable of reasonably ascertaining that the Defendants themselves injured him, the statute of limitations does not accrue until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, both the action and its cause, in other words, the Defendants' own misconduct.

64.     The theory of Plaintiffs' Title IX claims against Defendants is not that Plaintiff was sexually abused by any persons hired by Camp Ramah, but that Defendants and their various officials and administrators created the circumstances under which another person, Erlich, sexually abused him.

65.     In other words, Plaintiffs' Title IX claims against Camp Ramah is that if Defendants and their officials and administrators had taken action to prevent employees (i.e., Erlich) from abusing campers, Erlich would not have abused Plaintiffs.

66.     Thus, at all material times, Plaintiffs, did not know or should have known that their civil rights were violated at the times they were sexually abused when they were minor camp attendees.

67.     The Plaintiffs' abuse occurred, therefore, under circumstances created entirely by Defendants, and their officials and administrators.

68.     As Plaintiffs did not know, and had no reason to know, that their civil rights had been violated by the Defendants, and did not have actual or constructive knowledge that high-ranking administrators and officials at Camp Ramah had actual knowledge of Erlich's propensity to abuse boys at Camp Ramah, until 2016, their federal Title IX claims did not accrue during the time period of his sexual abuse.

69.     Plaintiff JOHN DOE's Title IX claims accrued, rather, in November, 2016, after JOHN DOE ascertained—after talking to JOHN DOE II about JOHN DOE II's Camp Ramah experiences, that high-ranking officials at Camp Ramah had actual knowledge of Erlich's propensity to sexually abuse boys prior to Erlich's sexual abuse of JOHN DOE on the camp Ramah premises.

70.     In 2016, moreover, JOHN DOE ascertained—for the first time—that Erlich had recently been arrested and convicted in Toronto, Canada, for sexually assaulting boys.

71.     Until 2016, therefore, JOHN DOE had no idea whatsoever that Erlich had abused any boys other than him, or that Defendants knew of Erlich's propensity to sexually abuse boys prior to his abuse of JOHN DOE.

72.     Likewise, Plaintiff JOHN DOE II's Title IX claims accrued in November 2016, when JOHN DOE informed JOHN DOE II that in 2012 Erlich had been arrested for (and later confessed to) sexually assaulting boys in Canada.

73.     Until that time, Plaintiff JOHN DOE II had no idea whatsoever that Erlich had abused any boys other than him, or that Defendants knew of Erlich's propensity to sexually abuse boys prior to Erlich's sexual abuse of JOHN DOE II.

74.     As such, Plaintiffs' Title IX claims did not accrue until 2016 and are thus not barred by the applicable three year statute of limitations (CPLR § 214(5)).

## TITLE IX HARM AND DAMAGES

75.     As a direct and proximate result of Defendants' violation of Title IX, Plaintiffs each suffered horrendous sexual abuse and resulting life-long physical and emotional harm, as described as length herein.

76.     Since 1971, JOHN DOE has suffered, and continues to suffer from, *inter alia,* extreme depression and severe emotional distress, anxiety, guilt, drug and alcohol addiction and abuse problems, anger management issues, difficulty in maintaining trusting, loving relationships, marital issues (including a divorce), and difficulty in communicating with and relating to his children.

77.     Years ago, JOHN DOE was hospitalized twice after several serious suicide attempts.  He has been treated by 10 psychopharmacologists over the last 30 years.

78.     During his college years, in the early 1980s, his emotional pain and suffering was so severe that—at the recommendation of his school's dean, he was compelled to take a one year break from college.  He thus graduated a year after his original college-entry class (which had a negative financial impact for him).

79.     Since 1971, JOHN DOE II has suffered, and continues to suffer from, *inter alia,* extreme depression and severe emotional distress, extreme guilt, anxiety, humiliation, drug and alcohol abuse problems, anger management issues, confusion as to his sexual identity, problems

with concentrating in school, difficulty in maintaining trusting, loving relationships, intimacy issues, and extremely low self-esteem and self-confidence.

80.     The events of the Summer of 1971 were so damaging to JOHN DOE II that in subsequent years (when he was 15 and 19, respectively), he made two serious attempts to take his own life.  He has been treated by numerous psychopharmacologists over the last 30 years.

81.     All of this harm—to Plaintiffs and other victims of Erlich—was reasonably foreseeable to the Defendants at the time of their violations of Title IX.

82.     The acts and omission of Camp Ramah and the other Defendants, particularly their violations of Title IX, demonstrated a reckless and conscious disregard of the rights, health, and safety of the rights of Plaintiffs and other victims and potential victims of Erlich, and were so malicious, willful, and wanton, as to constitute a grievous injury to the public-at-large, as well as to the Plaintiffs, and give rise to punitive damages.

83.     Plaintiffs, pursuant to 42 U.S.C. § 1988, and related authority, also seek all reasonable legal fees, costs, and expenses, to be incurred in connection with his claim.

84.     As and for Count I, Plaintiffs herein thus each claims compensatory damages against each of the Defendants, jointly and severally in a sum not less than $10 Million, punitive damages in a sum not less than $10 Million, and reasonable attorneys' fees, costs, and expenses incurred in the prosecution of these claims.


### COUNT TWO: VIOLATION OF CIVIL RICO

85.     Plaintiffs repeat each of the allegations contained in paragraphs "1" through "84" herein, as if each has been fully set forth at length.

86.     Each of the Defendants herein is a "person" as that term is defined in 18 U.S.C. §1961(3).

87.     The above-named "ERLICH CONCEALMENT ENTERPRISE" consists of: (1) THE NATIONAL RAMAH COMMISSION, INC., (2) THE NATIONAL RAMAH COMMISSION OF THE JEWISH THEOLOGICAL SEMINARY, (3) THE JEWISH THEOLOGICAL SEMINARY, (4) RABBI DAVID SOLOFF, (5) RABBI KENNETH GREENE, (5) RABBI MELVIN N. SIRNER, (6) RABBI SHELDON DORFF, and (7) an association-in-fact consisting of each of the previously enumerated individuals and entities.

88.     The ERLICH CONCEALMENT ENTERPRISE constitutes an "enterprise" as defined in 18 U.S.C. §1961(4), in that , *inter alia*, at all material times, it was and still is an ongoing organization, and the various associates affiliated with said enterprise functioned and/or function as a continuing unit with one singular purpose:  to continue to derive income for THE NATIONAL RAMAH COMMISSION, INC., THE NATIONAL RAMAH COMMISSION OF THE JEWISH THEOLOGICAL SEMINARY,  THE JEWISH THEOLOGICAL SEMINARY, and themselves based on an ongoing scheme to conceal and cover up the nature and extent of the sexual abuse that occurred at Camp Ramah in the Berkshires in 1971 (by Erlich) and the emotional, physical and financial carnage incurred by Plaintiffs and myriad other victims that was left in the wake of Erlich's unchecked abuse.

89.     Upon information and belief, each of the Defendants directed, managed, and participated in the affairs of the enterprise, including the wrongful acts as alleged herein.

90.     At all material times, the ERLCIH CONCEALMENT ENTERPRISE has been and is engaged in activities which affect interstate commerce.

91.     In 1970, 1971, and every year thereafter through 2016, the institutional Defendants published, or caused or directed to be published, promotional materials, brochures,

and correspondence, in which they touted Camp Ramah (in the Berkshires) as a safe, nurturing and positive environment for educating Jewish youths.

92.     Said  promotional materials, brochures, and correspondence, were, upon information and belief, mailed and delivered, or caused and directed to be mailed and delivered, via the United States Postal Service, to all parents of former and current Camp Ramah attendees, as well as each of the Plaintiffs, and Camp Ramah alumni for whom Defendants had a current address, including hundreds of camp alumni who resided outside of the State of New York.

93.     Said interstate mailings, in 1970, 1971, and every year thereafter through 2016 2016 (46 years), deliberately and fraudulently concealed from all recipients, including Plaintiffs and their parents, that the Defendants knew that Erlich had sexually abused Camp Ramah attendees in 1971, and that Defendants knew of Erlich's sexual misconduct but elected to cover it up rather than report it to law enforcement officials and/or notify or warn Camp Ramah community members (i.e., parents and campers).

94.     Upon information and belief, each of the Defendants directed, operated, managed, and/or participated in the aforesaid 1970-2016 interstate mailings and had actual and/or constructive knowledge of their contents, representations, omissions, and concealments with respect to Erlich and his sexual misconduct at Camp Ramah.

95.     The  aforesaid conduct of Defendants violated 18 U.S.C. § 1341 ("Mail Fraud"), Fraud"), in that said mailings contained material and fraudulent misrepresentations and fraudulent concealments which were a substantial part of the Defendants' ongoing and prolonged scheme to defraud campers, parents, alumni, victims of Erlich, and others, and used interstate mail communications to further and perpetuate that scheme, and various campers, parents,

alumni, victims of Erlich, and others, relied on the false statements contained in said mailing by, *inter alia*, sending financial contributions to the institutional Defendants.

96.     The Defendants herein have engaged in a fraudulent scheme to conceal and cover-up Erlich's prolonged and repeated sexual abuse of boys in 1971, and to profit from that concealment by obtaining millions of dollars in contributions and other fundraising activities, and camp tuition payments, and otherwise, based on false pretenses and misrepresentations, by and through the misconduct described herein.

97.     The Defendants are distinct entities from the ERLICH CONCEALMENT ENTERPRISE, and such Defendants are, and/or have been, operating, managing, conducting or participating in its affairs.

98.     The Defendants, RABBI DAVID SOLOFF, RABBI KENNETH GREENE, RABBI MELVIN N. SIRNER, and RABBI SHELDON DORFF, were and/or are employed by or associated with the ERLICH CONCEALMENT ENTERPRISE which is engaged in and/or affects interstate commerce and have controlled, dominated, caused, conducted or participated, directly or indirectly, in the conduct of the ERLICH CONCEALMENT ENTERPRISE'S affairs, through a pattern of racketeering activity as alleged herein, in violation of 18 U.S.C. § 1962(c).

99.     Defendants, THE NATIONAL RAMAH COMMISSION, INC., THE NATIONAL RAMAH COMMISSION OF THE JEWISH THEOLOGICAL SEMINARY,  THE JEWISH THEOLOGICAL SEMINARY, RABBI DAVID SOLOFF, RABBI KENNETH GREENE, RABBI MELVIN N. SIRNER, and RABBI SHELDON DORFF, by engaging in the conduct described herein and otherwise, and/or by aiding and abetting said conduct, likewise conspired to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1962(d).

## RACKETEERING ACTIVITIES
## CONTINUITY REQUIREMENT

100.     The aforesaid acts of Defendants, particularly the predicate acts of Defendants as set forth at length herein, constitute a "pattern of racketeering activity" in that they involve a threat of continuing activity.  Said threat was in fact realized.

101.     The aforesaid predicate acts of Defendants, which extend for a period of time greater than three (3) years, demonstrate the existence of "closed-ended continuity" in that said acts refer to a closed period of repeated conduct.

102.     In addition, the aforesaid predicate acts of Defendants demonstrate the existence of "open-ended continuity" in that the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and are part of the ERLICH CONCEALMENT ENTERPRISE'S regular way of doing business.  Said threat of repetition extended into the future–and has continued to the present day.

## STANDING - DIRECT INJURY TO "BUSINESS OR PROPERTY"

103.     As stated at length herein, each of the Plaintiffs was injured in his "business or property" as a direct and proximate result of the aforesaid predicate acts and RICO violations of the Defendants.

104.     Upon information and belief, the damages and injuries to Plaintiffs' "business and property" were caused directly by the Defendants' RICO violations, were a reasonably foreseeable consequence of Defendants' RICO violations, and are clear and definite.

105.     Plaintiffs' entitlement to obtain Civil RICO damages as "property" for their viable lost legal claims is clear and definite.

106.    The Defendants knew, at all material times, that the myriad victims of Erlich would suffer numerous and severe injuries to their "business or property" by reason of the Defendants' ongoing misconduct, racketeering activities, self-concealing fraud, and fraudulent misrepresentations and concealments.

107.    Each of the Plaintiffs (and their parents) received various fraudulent mailings in 1971 through 2016 from the Defendants, which stated that Camp Ramah was a safe and nurturing environment for Jewish youths, and relied to his considerable detriment on the representations contained therein.

108.    Plaintiff JOHN DOE, in or about 2008, in reliance on said fraudulent mailings and representations contained therein, actually contributed the sum of $5,000.00 as a financial donation to THE NATIONAL RAMAH COMMISSION, INC. for the establishment of a new Camp Ramah in Colorado.

109.    Plaintiff JOHN DOE, in or about 1995, in reliance on said fraudulent mailings and representation contained therein, actually contributed the sum of $1,000.00 as a financial donation to THE JEWISH THEOLOGICAL SEMINARY in honor of his grandfather.

110.    The contributions of Plaintiff JOHN DOE  to THE NATIONAL RAMAH COMMISSION, INC. and THE JEWISH THEOLOGICAL SEMINARY, demonstrates the long-standing success of Defendants' conspiracy, concealment, and cover-up, of their role in condoning and facilitating Erlich's sexual abuse of numerous children.

111.    Each of the Plaintiffs knew that Erlich had sexually abused him, but did not know, and had no reason to know, that various high-ranking administrators and officials of the institutional Defendants had actual knowledge of Erlich's repeated sexual abuse of boys, and

propensity to sexually abuse boys, as early as June, 1971, and continuing throughout the duration of Erlich's tenure as a camp counselor (in the Summer of 1971) and thereafter.

112.     Had Plaintiff JOHN DOE known of Defendants' knowledge, condonation, and facilitation of Erlich's sexual abuse, he most certainly would not have tendered any financial contributions to THE NATIONAL RAMAH COMMISSION, INC. or THE JEWISH THEOLOGICAL SEMINARY.

113.     Plaintiff JOHN DOE, therefore, for Civil RICO purposes, was injured in his "business or property" to the extent that – in reliance on Defendants' false mailings and representations (as stated above) – he was induced to make financial contributions to THE NATIONAL RAMAH COMMISSION, INC. and THE JEWISH THEOLOGICAL SEMINARY that he otherwise would not have made (had he known the truth on these issues).

114.     At all material times, the Defendants knew that the specific injuries, particularly to "business or property," which Plaintiffs incurred as a result of the Defendants' acts and/or omissions, were reasonably foreseeable and a natural consequence of said acts or omissions.

115.     At all material times, each of the Plaintiffs, as well as all other victims of Erlich, were the specific targets of the Defendants' racketeering enterprise.

116.     The actions of the Defendants were thus a substantial factor in, and directly related to, Plaintiffs' injuries, as alleged herein, and each of those specific injuries were reasonably foreseeable to the Defendants.

117.     The Defendants' misconduct, as alleged herein, was the proximate cause of Plaintiffs' injuries, particularly to their "business or property," as there was a direct relationship between Plaintiffs' injuries and Defendants' injurious conduct.

118.    The Defendants' racketeering activities, and Civil RICO predicate acts, as alleged herein, were a proximate cause of Plaintiffs' injuries, particularly to their "business or property," as there was a direct relationship between Plaintiffs' injuries and Defendants' racketeering activities and Civil RICO predicate acts.

119.    Upon information and belief, it is well-established in the medical and scientific communities that men who were sexually abused as children are likely to suffer from long-term sexual problems, dysfunctions or compulsions, problems with intimacy, shame, guilt, self-blame, low self-esteem, negative self-images, increased anger, increased rates of drug and/or alcohol abuse, increased probabilities of fear and major depression, increased risk of suicide attempts, social anxiety, conduct disorder, and an increased rate of divorce.  (*See* Marci A. Hamilton, *Facts About Childhood Sexual Abuse*).

120.    Upon information and belief, it is well-established in the medical and scientific communities that sexual abuse can alter a child's physical, emotional, cognitive and social development and impact his physical and mental health throughout his lifetime.   A 2002 study by Elliot Nelson, M.D., et al., reaffirmed that childhood sexual abuse has a profound negative impact throughout the victim's life.  (*See* Elliot Nelson et al., *Association Between Self-Reported Childhood Sexual Abuse and Adverse Psychosocial Outcomes: Results from a Twin Study*, 59(2) Archives of General Psychiatry, 139, 139-45).

121.     Moreover, it is often not until years after the sexual abuse that victims experience the potential range of negative outcomes.  According to Clinician Mic Hunter, in *Abused Boys*, 59 (1991):

> *Some of the effects of sexual abuse do not become apparent until the victim is an adult and a major life event, such as marriage or birth of a child, takes place.  Therefore, a child who seems unharmed by childhood abuse can develop crippling symptoms years later and can have a difficult time connecting his adult problems with his past.*

122.     Plaintiffs have each suffered a full range of the injuries which have been demonstrated to affect sexual abuse victims.

123.     Plaintiffs allege a myriad of economic losses which were caused directly by Defendants' alleged racketeering activities.  Specifically, as a direct and proximate result of Defendants' decades-long self-concealing fraud Plaintiffs incurred pecuniary losses which are associated with and connected to, but separate and distinct from, their  physical injuries, such as: costs for psychological counseling, lost wages, lost business opportunities, diminished and delayed educational and vocational opportunities, and financial contributions to the camp-affiliated organizations.  Each of the Plaintiffs, therefore, has paid a steep "economic price" for Defendants' racketeering activities and misconduct.

124.     Moreover, the economic consequences of physical and emotional injuries caused by the criminal concealment of childhood sexual abuse has taken, in aggregate, a massive and severe toll on the economic well-being of both the nation and the thousands of victims of childhood sexual abuse (including each of the Plaintiffs in this case).

125.     A 1996 National Institute of Justice Study, Victim Costs and
Consequences: A New Look, estimated that each year child sexual abuse in America costs
the nation $35 billion.

126.     Adults Responsibility in the Prevention of Child Sexual Abuse, Darkness
to Light (http://www.darkness2light.org/KnowAbout/adults_responsible.asp)
provides that: "Victims of child sexual abuse generally spend more on psychiatric care and
medical services throughout their lives . . . Child sexual abuse causes lost potential and
productivity.  These expenses, which would not be necessary if not for sexual abuse, are a
financial drain to each and every one of us."

127.     An Economic Impact Study (September 2007) of Prevent Child Abuse America,
Total Estimated Cost of Child Abuse and Neglect in the United States, by Ching-Tung Wang,
Ph.D. and John Holton, Ph.D. (Ex. Z), concluded that, "[b]ased on data drawn from a variety of
sources, the estimated annual cost of child abuse and neglect is $103.8 billion in 2007 value."

128.     The Brown University Child and Adolescent Behavior Letter, "Let's Have an
Honest Fight Against Child Sex Abuse," by Ross E. Cheit and Jennifer Freys, stated that: "The
Department of Justice estimates rape and sexual abuse of children costs $24.5 billion per  year." .

129.     The scars borne by childhood sex abuse victims, although invisible to the naked
eye, are profound and long-lasting–and cause direct and substantial short-term and long-term
economic losses which manifest in numerous ways.

130.     Impacts of Childhood Abuse, Adults Surviving Child Abuse
(http:www.asca.org.au/displaycommon.cfm?an=1&subarticlenbr=201) provides that: "Many
survivors' lives are characterized by frequent issues such as job disappointments, relocations,
failed relationships and financial setbacks–many the result of unresolved childhood abuse

issues."

131.    "Why the Costs of Sexual Abuse and the Costs of Non-Enforcement of Anti-Sexual Abuse Laws are Too High," by Marci Hamilton, dated June 26, 2008,  provides that: "The status quo is not just a moral outrage, but also an irrational economic situation. The costs to a society of sexual abuse are enormous:  Victims suffer from drug addiction; alcoholism; mental illness; often rising to the level of disability; suicide; and broken marriages, and as workers may be less productive than they could have been."

132.    Impact of Child Abuse, Adults Surviving Child Abuse: Impact of Child Abuse (http://www.asca.org.au/displaycommon.cfm?an=1&subarticlenbr=11) provides that: "The USA Surgeon General states [that] severe and repeated trauma during youth may have enduring effects upon both neurobiological and psychological development altering stress responsibility and altering adult behavior patterns . . . these individuals experience a greatly increased risk of mood, anxiety and personality disorders throughout adult life."

133.    In Violence in the Transition to Adulthood: Adolescent Victimization, Education, and Socioeconomic Attainment in Later Life," Journal of Research on Adolescence, 14(2), 127-158 (2004), Ross Macmillan and John Hagan, relied on empirical data and concluded that the consequences of childhood sexual abuse was likely to cause a lowering of the amount and quality of a victim's education and reduced his annual income (as compared to a non-victim) by approximately $6,000.00 per year.

134.    When, as here, the criminal concealment of childhood sex abuse includes racketeering activities by the conspirators, Plaintiffs have suffered precisely the type of injury that RICO was designed to address and deter.

135.     The phrase "business and property", therefore, should include the aforesaid pecuniary losses suffered by Plaintiffs which were closely associated with, but separate and distinct from, the personal injuries they incurred as a result of Defendants' misconduct.  This interpretation is supported by the explicit and expressed policies of RICO.


## AD DAMNUM CLAUSE

WHEREFORE, based on the aforesaid, Plaintiffs hereby demand judgment in their favor and against each of the Defendants, jointly and severally, as follows:

1.     As and for Count I, Violation of Title IX, a sum not less than $10 Million in compensatory damages, and a sum not less than $10 Million in punitive damages, and, pursuant to the Civil Rights Attorney's Fees Award Acts of 1976, 42 U.S.C. § 1988, and/or any other appropriate authority, all reasonable attorneys' fees, costs, and expenses, incurred in the prosecution of this case; and

2.     As and for Count II, Violation of Civil RICO, a sum not less than $10 Million in compensatory damages, treble damages, and a sum not less than $10 Million in punitive damages, and, pursuant to 18 U.S.C.  § 1964(c), and/or any other appropriate authority, all reasonable attorneys' fees, costs, and expenses, incurred in the prosecution of this case; and

3.     Any other, different or further relief as to this Honorable Court may seem just, proper or necessary.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: January 9, 2017                               Respectfully submitted
       Orangeburg, New York

**KEVIN T. MULHEARN, P.C.**

*Kevin T. Mulhearn*

_____
KEVIN T. MULHEARN, ESQ.
(KM 2301)
*Attorneys for Plaintiffs*
60 Dutch Hill Road, Suite 15
Orangeburg, New York 10962
Phone: (845) 398-0361
Fax: (845) 398-3836
Email: kmulhearn@ktmlaw.net